# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| CARYL LYNN ABBOTT,<br><br>Petitioner,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Respondent, | Case No.: 2:18-cv-00201-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Petitioner Caryl Lynn Abbott's Petition for Review (Dkt. 1), seeking review of the Social Security Administration's decision denying her application for Social Security Disability Benefits for lack of disability. *See* Pet. for Review (Dkt. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. <u>ADMINISTRATIVE PROCEEDINGS</u>

On March 9, 2016, Petitioner Caryl Lynn Abbott ("Petitioner") protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning February 14, 2016. This claim was initially denied on August 5, 2016 and, again, on reconsideration on November 29, 2016. On December 22, 2016, Petitioner timely filed a Request for Hearing. On November 8, 2017, Administrative Law Judge ("ALJ") Marie Palachuk held a hearing in Spokane, Washington, at which time Petitioner, represented by attorney Mark B. Jones, appeared and testified. Also appearing and testifying were (1) Jack LeBeau, M.D., an impartial medical expert, and (2) Daniel R. McKinney Sr., an impartial vocational expert.

On December 5, 2017, the ALJ issued a Decision denying Petitioner's claims, finding that she was not disabled within the meaning of the Social Security Act. Petitioner timely

**MEMORANDUM DECISION AND ORDER - 1**

requested review from the Appeals Council and, on March 9, 2018, the Appeals Council denied Petitioner's Request for Review, making final the ALJ's Decision.

Having exhausted her administrative remedies, Petitioner timely filed the instant action, arguing generally that "[t]he conclusions and findings of fact of the [Respondent] are not supported by substantial evidence and are contrary to law and regulation." Pet. for Review, p. 2 (Dkt. 1). Specifically, Petitioner claims that (1) "the ALJ mis-stated what the medical expert said, then adopted it as her own"; (2) the ALJ erred in deciding that she did not meet or equal Listing 1.04A; and (3) "the ALJ's light [residual functional capacity] is not supported by substantial evidence." Pet.'s Brief, pp. 8-13 (Dkt. 15). Petitioner therefore requests that the Court either reverse the ALJ's Decision and find that she is entitled to disability benefits or, alternatively, remand the case for further proceedings and award attorneys' fees. *See id*. at p. 14; *see also* Pet. for Review, p. 2 (Dkt. 1).

## II. STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. *See* 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *See Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support an ALJ's finding/conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The standard requires more than a scintilla

**MEMORANDUM DECISION AND ORDER - 2**

but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

As to questions of fact, the Court's role is to review the record as a whole to determine whether it contains evidence allowing a reasonable mind to accept the conclusions reached by the ALJ. *See Richardson*, 402 U.S. at 401. The ALJ is responsible for determining credibility and resolving conflicts within the medical testimony (*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving any ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence contained in the record (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). Where the evidence is susceptible to more than one rational interpretation, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *See Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

As to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error. *See Matney*, 981 F.2d at 1019. At the same time, the ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id*. However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *See Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III. **DISCUSSION**

**A.     Sequential Process**

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a five-step sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) –

**MEMORANDUM DECISION AND ORDER - 3**

within the meaning of the Social Security Act. *See Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983).

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). *See* 20 C.F.R. § 404.1520(b). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. *See* 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. *See* 20 C.F.R. § 404.1572(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe her physical/mental impairments are and regardless of her age, education, and work experience. If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner "has not engaged in substantial gainful activity since the alleged onset date." (AR 13).

The second step requires a determination of whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. *See* 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. *See* 20 C.F.R. § 404.1521; *see also* Social Security Rulings ("SSRs") 85-28, and 16-3p. If there is no severe medically determinable impairment or combination of impairments, benefits are denied. Here, the ALJ found that Petitioner has the following severe impairments: "obesity; degenerative disc disease of the cervical and lumbar spine; occipital lobe stroke; hypertension; acute respiratory failure; multi-joint osteoarthritis; [and] diabetes mellitus with neuropathy." (AR 13) ("[T]hese

impairments constitute more than slight abnormalities and have more than a minimal effect on the claimant's ability to perform basic work activities . . .").

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded. *See* 20 C.F.R. § 404.1509. If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. Here, the ALJ concluded that Petitioner's above-listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. *See* (AR 16-17).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. § 404.1520(e), 404.1545; *see also* SSR 96-8p. On this point, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that since February 14, 2016, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant could stand and walk up to one hour at a time (three hours per day), and requires the ability to alternate between sitting and standing every 60 minutes. The claimant can frequently push and pull bilaterally. The claimant can never climb ladders, ropes, or scaffolds, and can occasionally perform all other postural activities. The claimant is limited to occasional bilateral overhead reaching, and frequent reaching in all other directions. The claimant must avoid concentrated exposure to extreme cold, industrial vibration, and hazards. The claimant could be exposed to no more than heavy traffic level noise without ear protection.

**MEMORANDUM DECISION AND ORDER - 5**

(AR 17).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1512(f), 404.1560(c); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). Here, the ALJ found that Petitioner has been unable to perform any past relevant work but that, considering her age (at least prior to September 6, 2017),[1] education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform, including product assembler, electronics worker, and mail clerk. *See* (AR 20-22). Therefore, the ALJ concluded that Petitioner "was not disabled prior to September 6, 2017, but became disabled on that date and has continued to be disabled through the date of this decision." (AR 22).

**B.     Analysis**

   1.     <u>The ALJ Reasonably Accounted for Dr. LeBeau's Opinions</u>

At the November 8, 2017 hearing, Dr. LeBeau testified that a person with Petitioner's limitations is capable of (1) sitting two hours at a time, for a total of six hours; (2) standing one hour at a time, for a total of three hours; and (3) walking for half-an-hour, for a total of two hours. *See* (AR 47). The ALJ assigned Dr. LeBeau's opinions "great weight," in turn utilizing

---

[1] According to the ALJ: "Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. Applying the age categories non-mechanically, and considering the additional adversities in this case, on September 6, 2017, the claimant's age category changed to an individual of advanced age." (AR 20); *see also* Pet.'s Brief, p. 3 (Dkt. 15) ("In the ALJ's decision, she concluded the Petitioner could not perform past work but had the residual functional capacity to perform light work. *The ALJ further found that application of the 'grid rules' was appropriate when the Petitioner turned 55 years old in 2017. The ALJ denied benefits for the earlier period since the [alleged onset date] (February 2016 to September 2017).*") (emphasis added).

**MEMORANDUM DECISION AND ORDER - 6**

them to "form[ ] the basis for the residual functional capacity assigned" – in particular, that Petitioner's RFC allows her to perform light work. (AR 19).[2]

Petitioner argues that, based upon Dr. LeBeau's testimony, she is only capable of sedentary work, not light work. *See* Pet.'s Brief, pp. 8-9 (Dkt. 15) ("An individual who can stand and walk five hours of an 8-hour day cannot perform 'light work' by definition. Petitioner must be able to stand/walk six (6) hours of an eight-hour day by the very definition of 'light work.'"). Petitioner premises her argument on SSR 83-10, which indeed specifies that, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the *full range* of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour day." SSR 83-10, *available at* 1983 WL 31251 (emphasis added); *see also* 20 C.F.R. § 416.967(b) ("The *full range* of light work requires standing and walking, off and on, for a total of approximately 6 hours of an 8-hour workday.") (emphasis added).

Petitioner's reliance on SSR 83-10 does not fully describe the regulation. SSR 83-10 does not require six hours of standing and/or walking for all jobs classified as light work; it merely describes the activities that would be required of a person able to perform the *full range* of light work. In contrast, the ALJ in this case explicitly found that Petitioner's limitations, including the standing and walking limitations, did *not* allow her to perform the full range of light work that is set forth in SSR 83-10. *See* (AR 17-20); *see also Polley v. Comm'r of Soc. Sec. Admin.*, 173 F.3d 861, at *1 (1999) (rejecting argument that sit/stand option precludes finding of

---

[2] There is a mischaracterization of Dr. LeBeau's testimony in the ALJ's decision, where the ALJ stated: "Dr. LeBeau testified the claimant could perform a range of light work, sitting up to two hours at a time (6 hours total), *and standing or walking up to one hour (three hours total)*." (AR 19) (emphasis added). Dr. LeBeau testified that Petitioner could stand or walk for a total of five hours – not three. *See supra*. The ALJ therefore imposed more restrictive limitations on Petitioner than Dr. LeBeau did. Regardless, any differences on this point is immaterial to Petitioner's argument that Dr. LeBeau's testimony reflects that Petitioner is capable of only sedentary work, not light work. *See infra*.

**MEMORANDUM DECISION AND ORDER - 7**

light work); *Ortiz v. Colvin*, 2014 WL 7149544, at *4 (C.D. Cal. 2014) (same); *Boster v. Comm'r Soc. Sec. Admin.*, 2008 WL 754275, at *4 (D. Idaho 2008) ("[T]here will be instances where a claimant's residual functional capacity will not fit precisely within one of the exertional categories of work."); SSR 00-4P, *available at* 2000 WL 1898704, at *3 ("The DOT [(Dictionary of Occupational Titles)] lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [vocational expert] . . . may be able to provide more specific information about jobs or occupations than the DOT.").

In other words, not all light work requires a claimant to be able to stand/walk six hours. Dr. LeBeau's testimony, alongside the testimony of the vocational expert, Mr. McKinney, is consistent with the ALJ's RFC assessment and conclusion that Petitioner can perform certain light work jobs. Accordingly, the ALJ reasonably accounted for Dr. LeBeau's opinions.

2. <u>The ALJ Did Not Err in Evaluating Whether the Severity of Petitioner's Impairments Meet or Medically Equal Listing 1.04A at Step Three of the Sequential Process</u>

Petitioner next argues that the ALJ failed to engage in the requisite analysis when considering whether Petitioner's alleged impairments meet or medically equal a listed impairment for disability determination purposes. *See* Pet.'s Brief, pp. 9-12 (Dkt. 15). As discussed above, an ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See supra*. If any of the impairments meet or equal a listed impairment, the claimant is deemed disabled. *Id.*

An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that impairment." *See* SSR 83-19, *available at* 1983 WL 31248; *see also* 20 C.F.R. § 404.1525; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

**MEMORANDUM DECISION AND ORDER - 8**

(impairment meets or equals listed impairment only if medical findings (defined as set of symptoms, signs, and laboratory findings) are at least equivalent in severity to set of medical findings for listed impairment). Though a claimant's burden to establish, the ALJ must nonetheless "evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). However, the ALJ is not required to state why a claimant fails to satisfy every criteria of the Listing if they adequately summarize and evaluate the evidence. *See Gonzalez v. Sullivan*, 914 F.2d 1197, 1200-01 (9th Cir. 1990); *Lewis*, 236 F.3d at 512.

According to the ALJ, Petitioner's impairments "do not manifest the signs, symptoms, and findings required to meet or medically equal any listing, adding that:

> In making this finding, the undersigned specially considered Listings 1.02 (*Major dysfunction of a joint*), 1.04 (*Disorders of the spine*), 3.02 (*Chronic respiratory disorders*), 4.04 (*Ischemic heart disease*), 9.00 (*Endocrine disorders*), 11.04 (*Vascular insult to the brain*), and 11.14 (*Peripheral neuropathy*). No treating or examining physician has recorded findings satisfying the criteria of any medical listing, nor does the evidence show medical findings that are equivalent in severity to the criteria of a medical listing. The discussion of the medical evidence throughout this decision supports this finding. Dr. LeBeau testified the claimant likely met listing level impairment during her hospital stay, but called her progress in rehabilitation "remarkable" and noted her most significant limitations did not last more than 12 months.

(AR 16). Petitioner contends that this finding was in error, arguing that her spinal impairments meet/medically equal Listing 1.04A. *See* Pet.'s Brief, p. 11-12 (Dkt. 15). The undersigned is not persuaded.

Listing 1.04A requires that the following criteria be met:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. *With . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy*

**MEMORANDUM DECISION AND ORDER - 9**

> *with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A (Paragraph A criteria in italics). Petitioner concedes that she does not technically meet all of the criteria for Listing 1.04A, arguing instead that the constellation of her impairments effectively equal Listing 1.04A. *See* Pet.'s Brief, p. 12 (Dkt. 15) ("The only element missing from the record required to meet Appendix 1, Section 1.04A, was a positive straight leg raising test. Caryl medically equals Appendix 1, Section 1.04A, and therefore the decision of the ALJ should be revered or remanded."). In an effort to establish as much, Petitioner makes the following arguments:

- "Without arguing as to whether Caryl's medical condition 'meets' [Listing 1.04A], there should be no question that she should be found to have 'medical equivalence.'"

- "The imaging also supports that Caryl had severe cervical and lumbar spine [degenerative disc disease]."

- "The record demonstrates that Caryl was receiving chronic pain management for her neck and back within weeks of her hearing. Obviously, if she needed epidural injections 'and a bilateral L4, L5 radiofrequency ablation,' she was at listing level due to the severity and location of the procedures."

- "Add to this the fact that [Dr. LeBeau] admitted he did not consider Caryl's lumbar spine issues in his testimony/RFC."

- "Please also remember the MRI taken 07/15/2016 demonstrated 'L5-S1 left paracentral disc extrusion with mass effect on the left S-1 nerve root.' Imaging studies (X-rays) taken in March 2017, demonstrate that Caryl has 'prominent spurring at the hip joint. Prominent spurring at tendon intersections including hamstrings, gluteus medius, and likely origin of gluteus minimus. No osseous destruction or AVN seen.'"

- "Caryl was also still dealing with the cognitive effects of her stroke."

- "Caryl's conditions were 'at least equal in severity and duration to the criteria of any listed impairment' when all of her orthopedic issues were considered in combination. Consideration of the impairments in combination did not occur, as [Dr. LeBeau] did not consider Caryl's lumbar spine issues by his admission. He

- and the ALJ also did not consider Caryl's hip spurring, and the effects this would have on her ability to stand and walk."

- [Benjamin] Kartchner[, M.D.,] further found "There is numbness/complete loss of sensation on the lateral side of bilateral lower extremities extending into the thighs but remaining laterally and not following a dermatomal pattern' and 'mild atrophy of musculature is noted throughout but more prominent in right thigh and lower leg musculature.'"

*Id*. at pp. 11-12 (internal citations omitted).

Petitioner's argument in this respect describes pieces of the medical record, but lacks a sufficient connecting of the dots between the evidence cited and what Listing 1.04A requires to meet her burden. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("[F]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is medically equivalent to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment."). Regardless, a closer look at Petitioner's above-noted references to the medical record illustrates that there is substantial evidence to support the ALJ's consideration of whether Petitioner's impairments meet or equal Listing 1.04A at step three of the sequential process.

First, Petitioner has problems related to her back and hips, and such problems are severe to point of requiring medication. The ALJ concluded as much when making his disability determination. *See supra* (citing (AR 13-15) (ALJ acknowledging that Petitioner "has a significant history of back problems" and "[d]iagnostic imaging shows osteoarthritis throughout the body" and that "[a]ffected joints, as shown by imaging, include the bilateral hip, bilateral knees, and right foot, concluding that Petitioner's degenerative disc disease of the cervical and lumbar spine and multi-joint osteoarthritis (among others) represent "severe impairments")). Even so, the ALJ specifically accounted for Petitioner's limitations during the fourth step of the sequential process (RFC analysis). *See supra* (citing (AR 17-20). Therefore, to the extent

**MEMORANDUM DECISION AND ORDER - 11**

Petitioner's arguments emphasize the existence of certain limiting impairments, they miss the point because the acknowledged limitations in the RFC accommodate her symptoms. The question is not whether such limitations exist but, rather, whether Petitioner is able to work despite such limitations.

Second, it is incorrect to imply – as Petitioner does – that Dr. LeBeau altogether failed to consider her lumbar spine issues when, in fact, he testified that Petitioner "very clearly [is] a victim of osteoarthropathy [that] affects her lumbar spine." (AR 45). And, though Dr. LeBeau may not have "concentrated much on the lumbar" (*see* (AR 56)) when reviewing Petitioner's medical records and opining on her ability to perform work activities on a sustained basis despite her impairments, the record also evidences that Petitioner showed "remarkable" improvement over time and, relatedly, there have been no indications that Petitioner's imaging results translated into functional limitations. On this point, Dr. LeBeau testified (in response to questions from both the ALJ and Petitioner's attorney):

> Q: So when you consider each of her conditions alone and then also consider them in combination, would she meet or equal any of the listings used by Social Security for at least a 12-month period of duration?
>
> A: Well, the point is that certainly when she was at the peak of her illness, she couldn't work, clearly. She was in an intensive care unit for weeks, and so forth and so on. *She did go to rehab after that and she's had some pretty remarkable progress. I mean, she's walking and she's moving around, and she's driving and, you know, all these things that were in doubt for a good while, have come back* and whatever happened with those occipital lobes, you know, it appears that she has a serviceable vision. Again, I don't know if she can see the fine print, but as long as she can drive, you know, she can't be all bad. So, you know, that is, is evidence of a good recovery, and I, I don't think that if we took all these other things, like hypertension, like diabetes, in the state that it's in, and so forth, and added that to the initial insults that she had, but also considering that those do not markedly include. I don't think I could put this all together as a, as an equals type listing, but certainly there's nothing in here that would be meets a listing. This would be – I'm trying to think, it's a peculiar combination of things. I guess it would go under 1.04, that would be the normal place for, you know, cervical spinal conditions, *and this doesn't really meet it long term. Short term, yes,*

**MEMORANDUM DECISION AND ORDER - 12**

> *but not long term, certainly not a year. I mean she was better in four months.*
>
> . . . .
>
> Q: So, in – given the – and I realize you don't have this, well, you may have it now, 15F, the MRI of the lumbar spine, what are we missing as far as elements for meeting 1.04 given that MRI . . . . The, the impression was L5-S1 left paracentral disc extrusion with mass effect on the left S1 nerve root, mildly progressed from the prior study and then they went off and that could potentially involve the left L5 nerve root and right S1. What are we missing for a, a meet on 1.04?
>
> A: Right. I, I think that, you know, while we, *we have our MRIs and they're so elegant, you know, as far as the presentation that they give, it's really, it really boils down to the functional status. You know, in other words, you may say, oh my God, she's got a bad knee, you know, stenotic foramen at L5 or something like that, and yet when you examine the patient, you find out they're not complaining and the nerve is working just fine. It's just in a tense spot, so, you know, I think we can't extrapolate, I don't think there's wisdom in trying – doing that, where you just have an MRI.* Now, here's the kind of thing though, let me go to 1.04 and if I may –
>
> Q: Let me –
>
> A: -- kind of read a little bit.
>
> Q: Let me help you, Judge, or Doctor, 7F says there is numbness, complete loss of sensation on the lateral side of the bilateral lower extremities extending into the thighs, but remaining laterally and not following a dermatomal pattern. . . . .
>
> A: That exam was about a good year plus, right, after the event.
>
> ALJ: No, it was five months after the event.
>
> A: Oh, was it five months? Okay, I'm sorry, I was thinking. Okay, so it was five months later. *I, I think you're still in a neurological world where things are not stable yet, and there's going to be improvement. That can go on, as you may know, for even sometimes years after an insult. So, I, I respect, you know, those findings at that time, but this is, you know, this is sometime later, and I, I would expect probably a lot of this is gone. I don't know exactly how her sensation is in the lower extremities right now, there's not much discussion of that, but maybe this thinking that maybe there's not much discussion is because there's not much concern. So I'm sorry if I'm kind of obtuse on that, but I, I think that this is just in a period when it was*

**MEMORANDUM DECISION AND ORDER - 13**

> close enough to the injury that there would be some things left that are going to disappear.

Q: So, we have the, the elements at least initially, now we don't have any documentation what their status is as of now, that's what you're saying?

A: I don't think, I don't think we have a, you know, a really, like a detailed neurological examination. When I say, for example, well, I was going to read you a little bit about what, what equaling, not equaling, sorry, but meeting 1.04 would imply is this; having some nerve compression, it can be cervical, pressurized by neuro and anatomic distribution of pain, meaning a strike like feeling of pain and numbness that in the case of the neck would run down the arm. In the case of the lower spine would run down the leg. The limitation in motion is fine. Motor loss, meaning, not get this, atrophy with associated muscle weakness of muscle weakness accompanied by sensory or reflex loss and so forth and so on and so on. I don't have a detailed neurological exam of the upper extremities to see how the various, you know, risks, all the reflexes and things like that are really operating right now, bicep reflex and so forth.

Q: Okay, well –

A: *So, I, I'm kind of surmising that probably those things are okay. The docs are not documenting them and, and checking them it seems, so you know –*

Q: If, if you look at –

A: -- I'm sorry, that's not the best answer but I've got to deal with, you know, the paperwork and the opinions and stuff that I got.

. . . .

ALJ: -- in follow-up to that, we do have a neurologic exam, it's not as detailed as the CE, but it's found in Exhibit 13F, in August of 2017, so that's just a few months ago, at the clinic. She was seen, it was August 15th of 2017, and under the neurological portion of the exam, it says neurological exam normal. Orientation is normal. Memory is normal. Cranial nerves are normal. Sensory is grossed intact. Motor is normal. Balance and gait are normal. Coordination is normal. Fine motor skills are normal and deep tendon reflexes are normal. isn't that a sensory and –

A: Yeah, he's –

ALJ: -- strength exam?

A: -- describing a blow by blow, you know, analysis. If you're going to talk about sensory, you talk about two-point discrimination and monofilaments

**MEMORANDUM DECISION AND ORDER - 14**

> and, and then sharp and so forth and so on, but he's saying there, at least, it's grossly intact. *You know, if we're talking about somebody who's numb in the knees, that's not grossly intact, you know, we're not going to see that here. In fact, when I saw this and I was kind of reassured that a lot of the initial troubles had, you know, deliberate statements about something like swallowing, it says markedly improved and so forth, which means normal or near normal. And then here, all the things you've considered about level of consciousness, psychiatric condition and so forth, it's, it's normal across the board.* That's on page 5, indeed, I've seen that.

(AR 45-46, 53, 55-56) (emphasis added).[3] In short, that Petitioner may have met or equaled Listing 1.04A for a discrete moment in time is not enough; her evolving progress since is consistent with Dr. LeBeau's testimony and supports the ALJ's decision that Petitioner's impairments do not meet or equal a listed impairment, including Listing 1.04A.[4]

Third, the ALJ's finding that Petitioner did *not* meet or equal a listed impairment is also supported by the opinions of the state agency reviewing physicians, who considered Listing 1.04A (among others) and concluded that Petitioner's condition(s) did not meet or equal its criteria. *See* (AR 83-86, 98-102).

---

[3] Additionally, as Respondent points out, though Dr. LeBeau had not reviewed Exhibit 15F prior to the hearing, the July 2016 MRI contained therein was included within Exhibit 8F (which he had reviewed). *See* Respt's Brief, p. 8 (Dkt. 16) (*comparing* (AR 1001-1002), *with* (AR 1144-1145)).

[4] This also supports the ALJ's limited consideration of Dr. Kartchner's opinions following a July 2016 medical consultative examination, with the ALJ stating:

> Dr. Kartchner assigned these limitations largely based on the claimant's significant physical illness requiring hospitalization in February 2016. This opinion acknowledges the claimant was likely to recover significant functional ability, and even allowed for the possibility of full and total recovery prior to the expiration of 12 months. *Record evidence shows the claimant recovered very well, as testified by Dr. LeBeau, within 12 months, and the assessed functional capacity was not consistent with this remarkable recovery.* This opinion is assigned limited weight as usurped by later data.

(AR 19) (internal citations omitted, emphasis added).

**MEMORANDUM DECISION AND ORDER - 15**

Listing criteria are demanding and stringent, with the burden of proof resting with a claimant. That burden is to provide and identify medical signs and laboratory findings that support all criteria for an impairment determination. *See, e.g.*, *Lewis*, 236 F.3d at 514. A diagnosis of a condition alone will not suffice; rather, the claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the Listing." 20 C.F.R. § 404.1525(d). Here, Petitioner suffers from impairments that no doubt impact her ability to work and might support a different conclusion than that reached by the ALJ. However, reversal is not required because there exists evidence in the record that might support different conclusions. *See Sharp*, 2009 WL 3199592 at *2. More is needed. While Petitioner may dispute the ALJ's findings, they were not given in a vacuum, nor are they disconnected with the surrounding medical record and balance of briefing.

In the role of reviewing the decision of the ALJ, on the record/briefing now before the Court, the Court's role is not to resolve any conflicting opinions and ultimately decide whether Petitioner is once-and-for-all disabled as that term is used within the Social Security regulations. Rather, this Court reviews the ALJ's decision so as to be certain that the ALJ's decision that Petitioner is not disabled is supported by the record. Here, the ALJ offered enough reasons for finding that Petitioner's impairments do not meet or equal a listed impairment. Because the evidence is sufficient to support the ALJ's conclusion in this respect, this Court will not substitute its judgment for that of the ALJ. *See Richardson*, 402 U.S. at 401; *Matney*, 981 F.2d at 1019.

3. The ALJ Did Not Err in Evaluating Petitioner's RFC

The ALJ determined that Petitioner retains the RFC to perform light work with certain limitations, and that there are jobs in the national economy that do not require activities precluded by her RFC. *See* (AR 17-20). The ALJ reasoned that Petitioner's RFC "is supported

**MEMORANDUM DECISION AND ORDER - 16**

by [Petitioner's] activities of daily living, the objective medical evidence of record, and the properly weighed opinion evidence." (AR 20). Petitioner contends that the ALJ erred on this issue, arguing that, "[a]ll of the objective evidence of record (excluding opinion testimony and the statements of the Petitioner or others on her behalf) support a finding of disability, and an RFC of less than light." Pet.'s Brief, p. 12 (Dkt. 15).[5]

Petitioner again focuses on the existence of certain diagnostic tests – without more – that, in Petitioner's view, *ipso facto* correlate to certain physical limitations amounting to a disability under the Social Security Act. But the argument does not take into account Petitioner's documented functional status (improvement) over time. *See id*. at pp. 12-13. In turn, because such an argument rises and falls with the Court's prior consideration of that issue (*see supra*), a repeated discussion of the merits of the ALJ's RFC determination is not necessary. Suffice it to say, for the reasons already articulated here, substantial evidence exists to support the ALJ's findings at the fourth and fifth steps of the sequential process. *See Bayliss v. Barnhart*, 427 F.3d

---

[5] Petitioner also asserts that the ALJ did not describe Petitioner's activities of daily living. *See* Pet.'s Brief, p. 13 (Dkt. 15) ("Further, the ALJ seems to rely on Caryl's Activities of Daily Living (ADL's) to support her finding, along with the ME's testimony. But the specific information about her ADL's are not set out by the ALJ."). This is not accurate; the ALJ specifically identified how "claimant's level of daily activity is not consistent with a more restrictive level of limitation than assigned." (AR 18) (going on to discuss those activities). Separately, to the extent Petitioner's argument on this point incorporates her testimony, it ignores the fact that the ALJ found her testimony to be inconsistent with the record. *See id*. ("After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; *however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported for the reasons explained in this decision*.") (emphasis added). Petitioner does not contest these findings. *See, e.g.*, *Wikoff v. Astrue*, 388 Fed. Appx. 735, 736 (9th Cir. 2010) ("Thus, the ALJ's adverse credibility determination supports the limited rejection of Dr. Dennis's opinion because it was primary based on Wikoff's subjective comments concerning her condition. And because Wikoff failed to show she had any marked limitations, she cannot establish that her impairments resulted in at least two of the B criteria.") (internal quotation marks and citations omitted); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ may reject treating doctor's opinion if it is based on claimant's self-reports that have been properly discounted as not credible).

**MEMORANDUM DECISION AND ORDER - 17**

1211, 1217 (9th Cir. 2005) (ALJ properly relied on vocational expert's testimony because "[t]he hypothetical that the ALJ posed to the [vocational expert] contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record.").

## IV. CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences from facts. *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642. If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, a reviewing court may not substitute its interpretation for that of the ALJ. *Key*, 754 F.2d at 1549.

The evidence relied upon by the ALJ can reasonably and rationally support the ALJ's well-formed conclusions, even though such evidence may be susceptible to a different interpretation. Accordingly, the ALJ's decisions as to Petitioner's disability claim were based on proper legal standards and supported by substantial evidence. Therefore, the Commissioner's determination that Petitioner is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record and is based upon an application of proper legal standards.

The Commissioner's decision is affirmed.

## V. ORDER

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action is DISMISSED in its entirety with prejudice.

DATED: September 30, 2019

_____
Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 18**